FILED

12/27/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0510

DA 15-0510

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 344

CHARLOTTE SUZOR,

   Plaintiff, Appellant and Cross-Appellee,

  v.

INTERNATIONAL PAPER COMPANY,
SEDGWICK CLAIMS MANAGEMENT
SERVICES INC., CINDY BERGLIND-GROOMS,
and DOROTHY "DOT" SCOTT,

   Defendants, Appellees and Cross-Appellants.

APPEAL FROM: District Court of the Fourth Judicial District,
      In and For the County of Missoula, Cause No. DV 10-1115
      Honorable Robert L. Deschamps, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Rex Palmer, Attorneys Inc., P.C., Missoula, Montana

   For Appellees:

     Gerry Fagan, Moulton Bellingham PC, Billings, Montana

        Submitted on Briefs: October 12, 2016

            Decided: December 27, 2016

Filed:

          _____
              Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Charlotte Suzor injured her knees in a workplace accident in 1982, and her knees have been prone to giving out unpredictably ever since. She settled her workers' compensation claims in 1987 with her self-insured employer, Champion International Corporation, but reserved the right to seek future medical benefits for ongoing complications from her injury. In 2009, Suzor fell and broke her hip after her knees gave out. Her physician filed a claim with Sedgwick Claims Management Services, Inc. (Sedgwick), the third-party administrator for the workers' compensation plan now funded by her employer's successor in interest, International Paper Company. Sedgwick initially denied the claim, leading Suzor to sue International Paper Company, Sedgwick, and two of Sedgwick's employees (collectively, the "Appellees") for bad faith and breach of fiduciary duty. Following a jury trial in the Fourth Judicial District Court, Missoula County, judgment was entered in favor of the Appellees. Suzor timely appealed. We affirm.

## ISSUES

¶2 We address the following issues on appeal:

*1. Did the Appellees owe Suzor a fiduciary duty?*

*2. Did the District Court abuse its discretion in denying Suzor's jury instruction on causation?*

*3. Was the mistaken association of the wrong juror questionnaire with a juror a structural error that necessitates a new trial?*

*4. Is the jury's award of no damages supported by sufficient evidence?*

*5. Did the District Court abuse its discretion in its award of attorney's fees?*

2

## BACKGROUND

¶3 In 1982, Suzor injured her knees while working for Champion International. At the time of her injury, Champion International self-insured its workers' compensation liability. Suzor eventually settled her workers' compensation claim, reserving the right to be reimbursed for all medical treatment that would result from her injury. At some point after her injury, International Paper bought Champion International and assumed its outstanding workers' compensation obligations. International Paper contracted with Sedgwick to handle workers' compensation claims as a third-party administrator.

¶4 In the spring of 2009, Suzor fell and fractured her hip while getting into her pickup truck. According to her orthopedist, Dr. Michael Woods, the patellectomy Suzor underwent to treat her prior injury had made her knees unstable, and that instability was the cause of the fall that broke her hip. Under the terms of her workers' compensation settlement, Suzor was entitled to medical benefits for the broken hip, as it was a consequence of her workplace injury.

¶5 Suzor made an appointment with Dr. Woods for April 23, 2009. The day after her appointment, Woods initiated a worker's compensation claim by requesting authorization for an MRI. Cindy Berglind-Grooms, a claims adjustor at Sedgwick, fielded the request and denied it the same day. Suzor visited Dr. Woods again on May 4, and Dr. Woods sent his notes from that appointment to Sedgwick to substantiate the claim. Sedgwick again denied the claim, concluding that it was "not related to the original claim."

¶6 Suzor met with Dr. Woods again on May 18. At that appointment, Suzor indicated the pain medication Dr. Woods had prescribed was working. Suzor and Dr.

Woods chose to wait and see how the hip would heal, and scheduled another appointment to reevaluate her progress in June. According to Dr. Woods' notes from the June appointment, Suzor and Dr. Woods decided to give the hip another month of healing without surgery, even though Suzor was feeling worse. Suzor met with Dr. Woods once more on July 9, 2009, and the treatment notes from that appointment indicate Suzor and Dr. Woods decided to pursue surgery instead of waiting for the hip to heal.

¶7     By August, Suzor had hired an attorney who wrote to Berglind-Grooms, asking her to reconsider the denial. On August 19, Sedgwick accepted the claim. The next day, Suzor underwent a pre-operative physical to prepare for hip surgery. Although the surgery was scheduled for August 26, Suzor postponed the operation due to a family emergency. On September 16, 2009, Suzor underwent surgery for her broken hip, and Sedgwick approved payment for all of Suzor's visits with Dr. Woods, and for the surgery.

¶8     Suzor filed suit on August 18, 2010, to recover damages for the Appellees' alleged breach of a fiduciary duty and bad faith. Suzor claimed that the initial denial of her medical benefits resulted in months of pain and suffering while she waited for Sedgwick to approve her surgery. Suzor joined as defendants Sedgwick, International Paper, Berglind-Grooms, and Dorothy Scott, a claims adjuster and Berglind-Grooms' supervisor at Sedgwick.

¶9     During discovery, Suzor requested production of contracts among Sedgwick, International Paper and Champion International, as well as financial and tax information from each defendant. When the Appellees objected to production of the requested

documents, Suzor filed a motion to compel discovery. On April 17, 2014, the District Court granted the motion in part and ordered the Appellees to turn over the requested contracts, but denied without prejudice Suzor's demand for tax and financial information, concluding that discovery of that information was premature because it pertained only to the question of punitive damages.

¶10 The Appellees filed a motion for summary judgment on Suzor's claim of breach of a fiduciary duty and punitive damages. On June 24, 2014, the District Court granted summary judgment to the Appellees on Suzor's fiduciary duty theory, determining that no legal authority supported the proposition that employers owe fiduciary duties to their employees in the context of workers' compensation insurance. At the same time, the District Court denied summary judgment on the question of punitive damages. On March 10, 2015, the District Court issued an order compelling production of the Appellees' financial and tax information, reasoning that the denial of summary judgment on punitive damages counseled in favor of discovery.

¶11 The case was tried before a jury over five days in April 2015. At the beginning of jury selection, the clerk of court called the roll of prospective jurors. The clerk called the name Steven Schmidt, to which Steven E. Schmidt (Juror Schmidt) responded. Unbeknownst to the parties, the clerk had mistakenly provided them with the completed jury questionnaire of Steven A. Schmidt before voir dire. This mistake was not realized until after the trial. Nonetheless, Suzor's counsel questioned Juror Schmidt during voir dire and passed the jury for cause.

¶12 Suzor submitted proposed jury instructions before the trial, including the following jury instruction on causation: "Defendants are liable if their conduct was a cause of Charlotte Suzor's harms. The conduct of Defendants is the cause of the harm if it helped produce it and if the harm would not have occurred without it." The District Court refused this instruction, reasoning the instruction was "a negligence instruction that doesn't apply well to the facts of this case and is confusing." Instead, the District Court instructed the jury that Charlotte had the burden to show that the Appellees breached a duty to her and caused her to suffer losses or harms.

¶13 At the end of the trial, the jury returned its verdict on a special verdict form, which posed two questions relevant to this appeal. First, the form asked whether "any of the Defendants breach[ed] their duty to Charlotte Suzor," and the jury answered in the affirmative. Second, the form asked whether "the breach of duty by any of the Defendants cause[d] Charlotte Suzor to suffer loss or harm," to which the jury answered "No." Because the jury found the Appellees did not cause Suzor any damages, the District Court entered judgment in favor of the Appellees.

¶14 After trial, Suzor filed a motion for fees related to her earlier motion to compel discovery, pursuant to M. R. Civ. P. 37. Appellees objected to the per-hour rate charged for Suzor's attorney's time, as well as 320 minutes of time calculated toward Suzor's attorney's fees, arguing that time was recorded after the District Court ruled on the motion to compel and therefore could not be awarded under M. R. Civ. P. 37. The District Court deducted the 320 minutes from the time awarded and split the difference between the parties' requested hourly rates.

¶15     Suzor timely appealed from the District Court's grant of summary judgment on the question of fiduciary duty, the jury's verdict, and the post-trial award of attorney's fees.

**STANDARDS OF REVIEW**

¶16     We review de novo a district court's grant of summary judgment, applying the criteria of M. R. Civ. P. 56. *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839. Whether a fiduciary duty exists between two parties is a question of law. *Gliko v. Permann*, 2006 MT 30, ¶ 24, 331 Mont. 112, 130 P.3d 155. We review questions of law de novo. *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 19, 336 Mont. 105, 152 P.3d 727.

¶17     Generally, we review a district court's denial of a motion for a new trial on the grounds listed in § 25-11-102, MCA, for a manifest abuse of discretion. *Cooper v. Hanson*, 2010 MT 113, ¶ 28, 356 Mont. 309, 234 P.3d 59. We have made an exception to that general standard in the case of § 25-11-102(6), MCA, which provides for a new trial if there is insufficient evidence to justify the verdict. The sufficiency of evidence is a question of law that does not involve discretion on the part of the district court. *Stubblefield v. Town of W. Yellowstone*, 2013 MT 78, ¶ 14, 369 Mont. 322, 298 P.3d 419. We therefore review de novo a district court's denial of a new trial on the basis of the sufficiency of the evidence. *Stubblefield*, ¶ 14 (citing *Giambra v. Kelsey*, 2007 MT 158, ¶ 26, 338 Mont. 19, 162 P.3d 134).

¶18     District courts have discretion to determine what constitutes reasonable attorney's fees. *Plath v. Schonrock*, 2003 MT 21, ¶ 40, 314 Mont. 101, 64 P.3d 984. We will not

disturb a district court's determination of attorney's fees absent an abuse of that discretion. *Plath*, ¶ 40.

## DISCUSSION

¶19 *1. Did the Appellees owe Suzor a fiduciary duty?*

¶20 The terms of an insurance policy may create fiduciary duties that insurers owe to their insureds. *See, e.g.*, *Gibson v. W. Fire Ins. Co.*, 210 Mont. 267, 275, 682 P.2d 725, 730 (1984). Those fiduciary duties arise from the contractual nature of the insurer-insured relationship. In *Mountain W. Farm Bureau Mut. Ins. Co. v. Brewer*, 2003 MT 98, 315 Mont. 231, 69 P.3d 652, we noted that a third-party claimant does not have a contractual relationship with an insurer, and therefore the fiduciary duties running from the insurer to the insured do not flow to the third-party claimant as well. *Brewer*, ¶ 38. Suzor seizes upon language we used in *Brewer*: "the [plaintiffs] point to no contractual corollary which would impose fiduciary obligations upon [the insurer]." *Brewer*, ¶ 38. Suzor reasons that the contractual relationship between an employee and a self-insured employer is the type of contractual corollary that creates a fiduciary duty running from the insured employer to the third-party beneficiary employee.

¶21 In *Brewer*, we noted several hallmarks of the traditional, contractual relationship associated with insurance: an contract for insurance purchased by the insured from the insurer, premiums paid by the insured, and the bargained-for benefit of a defense provided by the insurer. *Brewer*, ¶ 38. We observed that these hallmarks are missing in the context of a third-party claim, where no contract exists between the claimant and the insurer, the claimant pays no premiums, and an insurer is not obligated to defend the

8

claimant. Although our discussion only mentioned the duty to defend as a bargained-for benefit of insurance, the same logic applies to the bargained-for benefit of a duty to indemnify within limits—the third-party claimant is not entitled to such indemnification, but as a practical matter, she will be compensated by the insurer if she can establish the insured's liability.

¶22 For strong public policy reasons, workers' compensation insurance differs from traditional casualty insurance in important ways, but the hallmarks of insurance do not change substantially. The employer pays a premium, and in return the insurer agrees to indemnify the employer against most forms of tort liability it might otherwise incur if an employee is injured at work. The law does not allow significant deviation in this relationship. *See* §§ 39-71-406 (misdemeanor to make employee pay any part of premium), -407 (detailing the scope of liability assumed by the workers' compensation insurer), MCA. Admittedly, an employer who opts to self-insure under plan No. 1 strays further from the traditional insurance relationship by eliminating the insurance contract and replacing premiums with funds set aside and earmarked for the payment of claims as they arise. *See* §§ 39-71-2101 to -2115, MCA (describing self-insurance under compensation plan No. 1). However, the employees of a self-insured employer assume no new contractual rights or obligations as a result of their employer's choice. Consequently, an injured employee's position as a third-party claimant does not materially change in the context of self-insurance.

¶23 We decline Suzor's invitation to expand fiduciary duties to an employee–claimant in the context of employer self-insurance. As a preliminary matter, Suzor's contractual

9

corollary argument reaches only one of the Appellees, International Paper, as the successor in interest to her employment contract. Suzor cannot credibly argue that Sedgwick, Berglind-Grooms, and Scott were also parties to her employment contract. Moreover, Suzor's position is belied by her own complaint, in which she acknowledges that it was International Paper that was the insured under the worker's compensation insurance plan, and not Suzor as an employee. If International Paper had purchased workers' compensation insurance through a private insurer under plan No. 2 or the State Fund under plan No. 3, it would be beyond dispute that International Paper was the insured, and no fiduciary duties would extend beyond that insurer-insured relationship. International Paper's decision to self-insure under plan No. 1 makes it both the insurer and insured under the plan, but it does not alter Suzor's status as a third-party claimant. As such, the reasoning of *Brewer* controls Suzor's claim.

¶24 Suzor admits in her reply brief that we have not expressly adopted her contractual corollary argument, and she cites no persuasive authority to support the expansion of fiduciary duties from a workers' compensation insurer to an employee. Nonetheless, Suzor warns that denying her the benefit of a fiduciary duty owed by the Defendants would reduce *Brewer*'s "contractual corollary analysis" to a nullity. We disagree. Like the claimant in *Brewer*, Suzor is not an insured under the contract, she has not paid a premium, and she is not entitled to the bargained-for benefit of indemnification, although she will ultimately receive compensation just like any other third-party claimant. We therefore conclude as we did in *Brewer* that the third-party claimant, Suzor, is not owed a

fiduciary duty. Thus, the District Court did not err in granting summary judgment on the issue of fiduciary duty.

¶25   *2. Did the District Court abuse its discretion in denying Suzor's jury instruction on causation?*

¶26   "The purpose of jury instructions is to guarantee decisions consistent with the evidence and the law, which can be accomplished when the instructions are as plain, clear, concise, and brief as possible." *Goles v. Neumann*, 2011 MT 11, ¶ 9, 359 Mont. 132, 247 P.3d 1089. District courts exercise broad discretion when instructing juries, although that discretion is limited by the caveat that "instructions must fully and fairly instruct the jury regarding the applicable law." *Goles*, ¶ 9. If this overriding principle is satisfied, we will reverse a district court only if its instruction decision amounts to a manifest abuse of discretion. *Payne v. Knutson*, 2004 MT 271, ¶ 14, 323 Mont. 165, 99 P.3d 200. Even if a district court fails to provide a necessary instruction, we will not reverse the district court unless the omission prejudicially affected a party's substantial rights. *Busta v. Columbus Hosp.*, 276 Mont. 342, 373, 916 P.2d 122, 140-41 (1996).

¶27   Suzor argues the District Court erred in denying her proposed instruction on causation, which read as follows: "Defendants are liable if their conduct was a cause of Charlotte Suzor's harms. The conduct of Defendants is the cause of the harm if it helped produce it and if the harm would not have occurred without it." The proposed instruction was borrowed from pattern instructions for negligence actions and our decision in *Busta*. The District Court chose not to give the instruction, concluding it was "a modification of a negligence instruction that doesn't apply well to the facts of this case and is confusing."

11

Instead, the District Court instructed the jury that Suzor bore the burden of proving "Defendants breached their duty to her" and "Defendants' breach of their duty caused her to suffer losses or harms." Suzor offered no alternative instruction to elaborate on the meaning of "caused her to suffer losses or harms."

¶28 The District Court's instruction fully and fairly instructed the jury on Suzor's burden of proof. We have previously recognized that cause-in-fact is a "simple concept that most lay people are capable of understanding." *Busta*, 276 Mont. at 373, 916 P.2d at 140-41. We will not fault the District Court for presenting causation to the jury in terms that are clear and concise—after all, that is the purpose of jury instructions. Even if we were to conclude some elaboration on the concept of causation was necessary under the facts of this case, Suzor has not shown how the omitted instruction prejudiced her substantial rights. Therefore, the District Court did not abuse its discretion in denying Suzor's instruction on causation.

¶29 *3. Was the mistaken association of the wrong juror questionnaire with a juror a structural error that necessitates a new trial?*

¶30 A structural error is one that is

> typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding. Because of its nature, it cannot be qualitatively or quantitatively weighed against the admissible evidence introduced at trial. Structural error is presumptively prejudicial and is not subject to harmless error review . . . .

*State v. Van Kirk*, 2001 MT 184, ¶ 38, 306 Mont. 215, 32 P.3d 735. Constitutional errors are considered structural "only in a very limited class of cases." *State v. LaMere*, 2000 MT 45, ¶ 23, 298 Mont. 358, 2 P.3d 204 (internal quotation marks omitted). Most of our

12

structural error jurisprudence arises from criminal trials, in which we are particularly sensitive to the fair trial rights of defendants.

¶31    In the criminal context, we have held that the failure of a district court to substantially comply with jury selection statutes is a structural error that requires reversal. *LaMere*, ¶ 23.  In *LaMere*, the district court clerk summoned jurors by telephone, despite a statute that required the clerk to serve notice by mail.  *See* § 3-15-505, MCA (1997). The defendant in *LaMere* argued the telephone summons violated his right to a fair and impartial jury by effectively screening out Native Americans and potential jurors living below the poverty line.  The defendant provided statistical analysis of the distribution of telephone service in the county, which showed that Native Americans and jurors below the poverty line were significantly less likely to be reached by the clerk's telephonic summons.  After an extensive examination of the strong public policy and historic roots of the criminal defendant's right to a jury trial, we agreed that the defendant's rights were violated.    We noted that the statutes governing jury selection are "a legislative amplification of the constitutional . . . right to a speedy, public trial by an impartial jury." *LaMere*, ¶ 32 (internal quotation marks omitted).  We have consistently interpreted the right to an impartial jury as one that ensures juries will be randomly "'drawn from a cross section of the community.'" *LaMere*, ¶ 34 (quoting *State v. Taylor*, 168 Mont. 142, 145, 542 P.2d 100, 101 (1975)); *accord Tribby v. Nw. Bank of Great Falls*, 217 Mont. 196, 207, 704 P.2d 409, 416 (1985); *Dvorak v. Huntley Project Irrigation Dist.*, 196 Mont. 167, 170, 639 P.2d 62, 64 (1981).  Therefore, the jury selection statutes are

meant to preserve the randomness of the jury pool, which in turn preserves the impartiality of the entire jury system.

¶32 Suzor argues two jury selection statutes were implicated in the mix-up regarding Juror Schmidt's questionnaire: §§ 3-15-405 and 3-15-507, MCA. Section 3-15-507, MCA, requires the clerk of court to call the names of all jurors who were summoned but not excused. In this case, the clerk called the name Steven Schmidt, and Juror Schmidt responded. Suzor does not claim that Juror Schmidt was not the Steven Schmidt randomly drawn from the jury pool and summoned to court. Indeed, it would be highly unlikely that the wrong Steven Schmidt, having never received a summons, would come to the courtroom on his own volition and for no apparent reason on the day of voir dire. We find nothing in the record that suggests the clerk called the "wrong" Steven Schmidt on the day of jury selection. We therefore conclude that the clerk did not violate § 3-15-507, MCA.

¶33 Section 3-15-405, MCA, allows a clerk of court to attach questionnaires to the notices sent to all jurors drawn from the jury pool. The use of questionnaires is permissive, and nothing in the statute requires the clerk to collect questionnaires or guarantees the parties will have access to jurors' responses. The parties' access to the jury questionnaires is merely implied by the District Court's local rule that limits the parties' ability to question prospective jurors about matters already addressed in the questionnaires. Although the clerk mistakenly provided the parties with the wrong juror questionnaire for Juror Schmidt, the statute itself does not require the clerk to provide the

juror questionnaires to the parties. Thus, we cannot conclude that the clerk facially violated § 3-15-405, MCA.

¶34 We likewise cannot conclude that the juror questionnaire mix-up amounts to substantial noncompliance with the jury selection statutes. The purpose of the jury selection statutes is to preserve the impartiality of juries through a truly random drawing. Unlike *LaMere*, where the statutory violation disproportionately excluded Native Americans and the poor from the jury drawing, the clerk's mistake here did not undermine the randomness and impartiality of the jury drawing. Nor was the mistake a material deviation from the statutory process, as in *Tribby* and *Dvorak*. In essence, Suzor asks us to expand the doctrine of structural error beyond constitutional and statutory compliance to reach a mistake in performing a technical obligation merely implied by the local rules of the District Court. Because structural errors exist only in a very limited class of cases, we decline to construe structural error so broadly.

¶35 The question remains whether Suzor is entitled to a new trial pursuant to § 25-11-102(1) and (3), MCA. That statute allows a court to grant a new trial if a party's substantial rights were materially affected by an "irregularity in the proceedings of the court" or an "accident or surprise that ordinary prudence could not have guarded against." Section 25-11-102(1), (3), MCA. The manifest abuse of discretion required to reverse a district court's denial of a new trial is rare, but if "the prejudicial matter at issue undermines the fairness to such a degree that a new trial is the only remedy," we will reverse. *Cooper v. Hanson*, 2010 MT 113, ¶ 42, 356 Mont. 309, 234 P.3d 59 (internal quotation marks omitted).

15

¶36 Suzor has failed to show how the questionnaire mix-up prejudiced her rights. On appeal, Suzor hypothesizes that if she had received the correct questionnaire, her counsel may have asked additional questions about Juror Schmidt's familial relationship to an attorney and his prior experience with criminal proceedings. The transcript from voir dire shows Suzor's counsel questioned Juror Schmidt during voir dire, learned about Juror Schmidt's experience as a former police officer and his relationship with attorneys, and still passed the jury for cause. Ultimately, Juror Schmidt voted in Suzor's favor. We see nothing in the record that indicates Suzor's material rights were prejudiced, and we therefore conclude the District Court did not abuse its discretion in denying Suzor's motion for a new trial.

¶37 *4. Is the jury's award of no damages supported by sufficient evidence?*

¶38 Suzor also claims she is entitled to a new trial because the jury's verdict was not justified by sufficient evidence, citing § 25-11-102(6), MCA. Suzor reasons that the jury's verdict finding breach of duty without damages is inconsistent with uncontroverted evidence that she suffered great pain while awaiting surgery.

¶39 Defendants argue the jury's verdict is supported by testimony from Suzor and her doctor about her decision to postpone surgery in the hope her hip would heal naturally. Defendants maintain that it was reasonable for the jury to conclude that, even if Suzor's initial claim was wrongfully denied, Suzor suffered no damages attributable to the denial because Suzor's decision to postpone surgery was made of her own accord.

¶40 We will affirm a jury verdict if it is supported by substantial credible evidence. *D.R. Four Beat Alliance, LLC v. Sierra Prod. Co.*, 2009 MT 319, ¶ 23, 352 Mont. 435,

218 P.3d 827. Even if the supporting evidence is inherently weak or contradicted by other evidence, it will be considered substantial if a reasonable mind could find it adequate to support a conclusion. *D.R. Four Beat Alliance*, ¶ 23 (citing *Tinker v. Mont. State Fund*, 2009 MT 218, ¶ 36, 351 Mont. 305, 211 P.3d 194). Moreover, we will review evidence in the light most favorable to the prevailing party. *Ele v. Ehnes*, 2003 MT 131, ¶ 25, 316 Mont. 69, 68 P.3d 835 (citing *Magart v. Schank*, 2000 MT 279, ¶ 4, 302 Mont. 151, 13 P.3d 390). "It is not our function to agree or disagree with the jury's verdict and, consequently, if conflicting evidence exists, we do not retry the case because the jury chose to believe one party over the other." *Ele*, ¶ 25 (internal quotation marks omitted). Thus, we will not overturn a jury verdict as unsupported by the evidence unless there is a complete absence of any credible evidence to support it. *Stubblefield*, ¶ 18 (citing *Papich v. Quality Life Concepts, Inc.*, 2004 MT 116, ¶ 29, 321 Mont. 156, 91 P.3d 553). Reversal is rarely warranted under this strict standard. *Magart*, ¶ 4.

¶41 The District Court relied on *Ele* in denying Suzor's request for a new trial on damages. In *Ele*, we affirmed a district court's denial of a new trial on damages because the testimony at trial contradicted the plaintiff's claim that he was injured in an automobile accident, despite the defendant's admitted negligence. That testimony established that the plaintiff had preexisting injuries that could have been the cause of his claimed pain and suffering. Furthermore, his coworkers testified that he was still able to engage in activities his claimed injury would have prevented. In short, the jury's zero-damages award reflected the plaintiff's failure to prove the accident caused damages.

¶42 Suzor attempts to distinguish *Ele* and analogize her case to *Reis v. Luckett*, 2015 MT 337, 381 Mont. 490, 362 P.3d 632. *Reis* also involved an automobile accident where the defendant was admittedly negligent, but unlike *Ele*, it was undisputed in *Reis* that the injuries to the plaintiff's hand were caused by the accident. Thus, we concluded that the record lacked substantial credible evidence to support the jury's zero-damages award. *Reis* mirrors earlier cases in which we determined a new trial on damages was appropriate. *See Renville v. Taylor*, 2000 MT 217, 301 Mont. 99, 7 P.3d 400; *Thompson v. City of Bozeman*, 284 Mont. 440, 945 P.2d 48 (1997). In each of these cases, it was established by either uncontroverted evidence or the jury's verdict that the defendants caused the plaintiffs' damages. *See Reis*, ¶ 7; *Renville*, ¶ 25; *Thompson*, 284 Mont. at 446-47, 945 P.2d at 52.

¶43 Suzor's claim is clearly more analogous to *Ele* than *Reis*, *Renville*, and *Thompson*. As previously discussed, the jury was presented with adequate evidence to support a finding that Suzor's pain and suffering resulted from her own reluctance to undergo surgery. Moreover, Suzor admitted that she had not missed any treatment due to the initial denial. Unlike *Reis*, *Renville*, and *Thompson*, the jury heard evidence that contradicted Suzor's claim that the Appellees' breach was the cause of her damages. Because the record is not devoid of evidence supporting the jury's verdict, we will not displace it.

¶44 *5. Did the District Court abuse its discretion in its award of attorney's fees?*

¶45 A district court must award reasonable expenses and attorney's fees to a party who files a motion to compel discovery that is subsequently granted, subject to several

exceptions. M. R. Civ. P. 37(a)(5)(A). The same rule requires an award of expenses and fees if the requested discovery is turned over after the filing of a motion to compel, whether or not the District Court has ruled on the motion. The award contemplated by M. R. Civ. P. 37(a)(5)(A) is limited to the expenses and fees incurred in making the motion to compel. If the motion to compel is granted in part and denied in part, M. R. Civ. P. 37(a)(5)(C) allows a district court to apportion the expenses associated with the motion as it sees fit.

¶46 The reasonableness of attorney's fees must be determined from the facts of each case. *Plath*, ¶ 36. In *Swenson v. Janke*, 274 Mont. 354, 908 P.2d 678 (1995), we listed several non-exclusive factors to guide a court's determination of reasonableness. Although a district court's determination of reasonable attorney's fees is discretionary, if the record lacks evidence of the factors the district court considered, we cannot effectively review the court's decision. *Plath*, ¶ 39. We explained:

> [I]n contested cases we are inclined to follow those states requiring the introduction of proof from which a reasonable fee may be determined. *To award a fee in such a case without proof would be to disregard the fundamental rules of evidence. An award of fees, like any other award, must be based on competent evidence.*

*Plath*, ¶ 39 (internal quotation marks omitted) (alteration and emphasis in original).

¶47 Suzor objects to the District Court's decision to deduct 320 minutes from the recorded time she submitted for reimbursement pursuant to M. R. Civ. P. 37(a)(5)(A). Suzor argues that those 320 minutes were spent working to compel discovery of financial information relevant to a potential award of punitive damages—information that the District Court ultimately ordered the Appellees to produce. However, the District Court

noted those 320 minutes were recorded past the date of the Court's April 17, 2015, order granting in part and denying in part Suzor's motion to compel discovery. Critically, the April 17 order denied without prejudice Suzor's request for the financial information because discovery of the information was premature.

¶48 Once the District Court issued its order denying the financial discovery, Suzor was no longer entitled under M. R. Civ. P. 37(a)(5)(A) to reimbursement for the time her attorney spent seeking the financial information. Instead, the District Court's partial grant and partial denial of the motion invoked M. R. Civ. P. 37(a)(5)(C), which allowed the District Court to apportion the costs of the motion as it saw fit. The fact that the District Court eventually ordered the production of the information nearly a year after the April 17 order does not change the application of M. R. Civ. P. 37(a)(5)(C) to the time Suzor's attorney spent making the motion. Thus, we conclude that the District Court was free to apportion expenses and fees as it saw fit, and it did not abuse its discretion in denying Suzor the 320 minutes of attorney's fees.

¶49 Suzor also takes issue with the District Court's decision to calculate the attorney's fees at a $225 per hour rate. Counsel for Suzor submitted an affidavit to support his calculation of attorney's fees. Although that affidavit recites the *Swenson* factors, it does not apply them to the facts of the case or support them with evidence, nor does it explicitly state the hourly rate for its calculation of fees. Working backwards, the unstated hourly rate applied in the affidavit is $250 per hour. Suzor complains that Appellees' counsel never submitted an affidavit to support their suggested rate of $200 per hour. Instead, Appellees' counsel noted in their brief opposing Suzor's calculation

that he was paid only $200 per hour. On the basis of this briefing, the District Court chose to split the difference between the parties' proffered rates.

¶50 Suzor's argument for her hourly rate elevates form over function. Ideally, Appellees' counsel would have filed a separate affidavit stating the basis for the $200 per hour rate. By the same token, Suzor's counsel ideally would have applied the *Swenson* factors to the facts of this case, rather than merely reciting them in his affidavit. Under the facts of this case, we see little value in requiring Appellees' counsel to restate his hourly rate in an affidavit. The District Court had an adequate understanding of the character and importance of the litigation, the professional skill and experience called for, the attorneys' character, and the results secured by the services of the attorneys. This baseline understanding, combined with the hourly rates submitted by counsel for both parties, provided a sufficient basis for the District Court to determine a reasonable rate. We therefore conclude the District Court did not abuse its discretion in determining a reasonable award of attorney's fees.

## CONCLUSION

¶51 For the reasons stated above, we affirm the jury's verdict and the District Court's orders now on appeal.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ LAURIE McKINNON

21